UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Derrell Andre Richardson,

               Plaintiff,          Civil Action No. 11-10075

       vs.               District Judge Denise Page Hood

Commissioner of          Magistrate Judge Mona K. Majzoub
Social Security,

              Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Derrell Andre Richardson seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security income benefits for his leg amputation pain and alleged anxiety and depression.  (Dkt. 1.)  42 U.S.C. § 405(g), 42 U.S.C. § 1383(c). Before the Court are the parties' motions for summary judgment.  (Dkt. 8, 10.)

The Court has been referred these motions for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Dkt. 3.)  The Court has reviewed the pleadings, dispenses with a hearing, and is now ready to issue its report and recommendation.[1]

I.      **Recommendation**

The Court finds that substantial evidence supports Defendant's decision and that substantial evidence supports the ALJ's hypothetical posed to the vocational expert.  The Court therefore recommends denying Plaintiff's motion for summary judgment, granting Defendant's motion for summary judgment, and dismissing this case.

_____

[1]E.D. Mich. LR 7.1(f)(2).

1

## II.      Report

### A.      Facts

#### 1.      Procedural facts

On May 18, 2007 Plaintiff applied for social security income disability benefits.  (AR at 100.)  Defendant initially denied Plaintiff's application on July 27, 2007.  (*Id*. at 19.)  Plaintiff then requested a hearing.  (*Id.*)  On September 28, 2009 the ALJ conducted Plaintiff's hearing.  (*Id*. at 47.)  On January 20, 2010 the ALJ denied Plaintiff's request.  (*Id*. at  16.)   On February 1, 2010 Plaintiff sought review of the ALJ's decision.  (*Id*. at 14.)  On November 2, 2010 the Appeals Council denied Plaintiff request for review. (*Id*. at 1.)  Plaintiff filed this suit, seeking judicial review of that final decision, on January 6, 2011.  (Dkt. 1.)

#### 2.      Facts overview

Plaintiff claims that he is disabled due to his below-the-knee amputation, depression, and anxiety.  At the hearing, the ALJ questioned Plaintiff about his daily activities and his alleged depression and anxiety.  Much of Plaintiff's daily activities testimony is contradicted by Plaintiff's own disability report.  And Plaintiff's testimony about his depression and anxiety is not supported by the medical records.  The medical records show that, although Plaintiff is somewhat limited by his leg amputation, he still possess the capacity to perform sedentary work with some limitations.

#### 3.      The hearing

On September 28, 2009 the ALJ held Plaintiff's disability hearing.  (AR at 45.)  Plaintiff's testimony at the hearing is primarily noteworthy because it is contradicted by the medical evidence in the record, which the ALJ pointed out in his written decision denying Plaintiff his disability benefits request.

The ALJ questioned Plaintiff about his activities of daily living. (*Id*. at 51.) The ALJ asked Plaintiff what types of chores Plaintiff did. (*Id*.) Plaintiff responded that he was not able to do "too much" and then clarified that he does not do "any chores." (*Id*.) He stated that, if anything, he makes his bed. (*Id*.) The ALJ also asked Plaintiff if he helped with the cleaning. (*Id*.) Plaintiff answered that he could "probably clean for a second," but that he would not be able to bend over, or do any sweeping of floors or anything "like that." (*Id*.) When asked about grocery shopping, Plaintiff stated that he does not often go to the grocery store, and that when he does, he goes with his grandmother. (*Id*.)

Plaintiff then testified about his partial-leg amputation. (AR at 52.) The ALJ asked Plaintiff how well he could walk with his prosthesis. (*Id*.) Plaintiff said, "I can't walk - - I can walk fairly but not well with it." (*Id*.) Plaintiff stated that sores and calluses cause pain and thus inhibit his walking. (*Id*.) The ALJ then asked whether Plaintiff had any problems sitting. (*Id*. at 53.) Plaintiff stated he "ha[d] a problem sitting right here." (*Id*.) He added that his leg sometimes hurts and that he gets sharp pains sometimes. (*Id*.) To make it feel better, he stated that he "wiggle[s] it around and [that wiggling] kind of make[s] it feel better." (*Id*.)

At the hearing, the ALJ expressed his view of the case to Plaintiff's counsel:

> [L]et me tell you what my take on this case is. As you know[,] there are no medical records after June of 2007. I have nothing to verify [Plaintiff's] testimony that he's had ongoing problems with his prosthesis. I have nothing that I'm aware of to show that he can't sustain sedentary work.

(AR at 53.) The ALJ expressed his frustration with Plaintiff's counsel for his failure to present a full record to the ALJ. (AR at 54.)

The ALJ asked Plaintiff how recent his post traumatic stress disorder diagnosis was. (AR at 54.) Plaintiff stated that the diagnosis was just within the last year, and clarified that it was within

3

the last month or two.  (*Id.*)

Plaintiff's counsel questioned Plaintiff about his psychological diagnosis.  He asked what types of symptoms Plaintiff experienced.  (AR at 55.) Plaintiff stated that he saw "shadows of people maybe behind me."  He also stated, "I hear things and I just can't stay up.  I be hearing stuff.  I get paranoid what they have to say and I think somebody probably trying to get me or something.  I don't know."  (*Id.* at 55-56.)  Answering his attorney's question, Plaintiff also stated that he had a hard time paying attention "sometimes."  (*Id.* at 56.)  But this hard time was not all the time, because "sometimes," Plaintiff stated, he "will pay attention."  (*Id.*)  He testified that he suffers from memory loss–he forgets any type of appointments and forgets things unless he writes them down.  (*Id.*)

For social interaction, Plaintiff stated that he gets out "every once in a while" to visit a friend, but otherwise, people irritate him.  (*Id.*)  This irritation has caused him to "flip[] out [on] people and [become] berserk and just crazy."  (*Id.*)  Although he stays with his grandmother, he stated other people did not visit often.  (*Id.*)

The ALJ then questioned the vocational expert.  (AR at 57.)  The ALJ asked the vocational expert:

> I would ask you to consider an individual of [Plaintiff's] age, education, and work history who's able to perform work at the sedentary level that consists of no more than simple, routine, repetitious tasks with one or two-step instructions that doesn't require more than occasional contact with co-workers, supervisors, or the public. And that allows the worker to alternate sitting and standing at will.  Would there be any unskilled, entry-level occupations that this person could perform and, if so, would you tell us what they are?

(*Id.* at 58.)  The vocational expert testified that there would be jobs available that Plaintiff could perform.  (*Id.*)

Plaintiff's counsel questioned the vocational expert about absences per month and

4

concentration.  (AR at 59.)  The vocational expert testified that employers generally allow one unexcused absence per month in addition to regularly scheduled time off.  (*Id*.)  The vocational expert's answer to the concentration question is inaudible in the transcript.  (*Id*.)

###     4.     Medical records

Reviewing all of the medical records, the Court finds that Plaintiff did have a leg amputation as well as additional surgery on the amputation site.  The record also indicates that Plaintiff may suffer from anxiety or depression.  But, as is shown below, the record does not reveal how Plaintiff's amputation, depression, or anxiety limit his ability to perform substantial gainful activity.  And the medical records indicate that Plaintiff is able to at least perform sedentary work.

On June 27, 2006 Plaintiff filled out a disability report. (AR at 123.)  To the question "[w]hat are the illnesses, injuries, or condition that limit your ability to work," Plaintiff wrote, "[a]mputation below left knee."  (*Id*. at 129.)  The reports prompted Plaintiff to explain "how" his injury limited his ability to work; Plaintiff simply stated again that he had his leg amputated.  (*Id.*)  Also in the report, Plaintiff checked boxes that indicated that his leg amputation affected his ability to: lift, carry, stand, walk, climb stairs, bend, kneel, crawl, and reach.  (*Id.* at 140.)  Plaintiff indicated that his amputation did not affect his ability to sit, use his hands, see, hear, or talk.  (*Id.*)  Plaintiff did not explain "how" these attributes affected him, though.  (*Id.*)

In the report, Plaintiff also checked boxes that indicated that his ability to: pay attention, understand, finish something he started, read, watch a movie, follow written instructions, and follow spoken instructions, were not affected by his amputation.  (*Id*. at 127.)  Plaintiff did indicate that his ability to handle changes in his routine and handle stress were affected by his amputation.  (*Id.*)  He stated that he "take[s] longer to do anything because it's harder for [him] to walk around."  (*Id.*)  He

added that he is "very stress[ed]" because he is no longer able to walk.  (*Id.*)

Plaintiff also stated, in the report, that he does interact with others on a regular basis–by talking on the phone, going to the movies, going weekly to church, going weekly to visit family and friends.  (AR at 150.)

In a second disability report, Plaintiff reiterates the content of his first disability report.  (AR at 160.)  He adds that he "cannot do anything because [he is] on crutches and [has] no pro[s]thesis.  (*Id.*)

A June 20, 2008 Hurley Medical Center report shows that Plaintiff was able to ambulate with his prosthesis and a single crutch.  (AR at 196.)  The report also shows that Plaintiff was able to go up and down stairs, although he had less control when going down stairs.  (*Id.*)  The report graded both Plaintiff's mobility and his transfers (his ability to transfer from a sitting to standing position).  (*Id*. at 199.)  The report shows that Plaintiff had independent functioning in both mobility and transfers.  (*Id.*)  Plaintiff's balance was also "good" (on a "good-fair-poor" scale), although he was not able to fully shift his weight to his left side.  (*Id.*)

On May 1, 2009 Plaintiff began a treating relationship with Dr. Stoker at Valley Medical Center in Flint, Michigan.  (AR at 244.)  On Plaintiff's initial history form, Dr. Stoker noted that Plaintiff complained of leg pain and requested a referral to mental health due to daydreams, bad thoughts, anger, losing focus, and being forgetful.  (*Id.*)  Dr. Stoker noted anxiety.  (*Id.*)  Dr. Stoker evaluated Plaintiff's musculoskeletal condition.  (*Id*. at 246.)  Dr. Stoker noted that Plaintiff was able to walk and stand without difficulty.  (*Id*. at 246.)

Dr. Stoker also commented on Plaintiff's psychiatric health.  (AR at 246.)  Dr. Stoker noted that Plaintiff's judgment and insight were normal for everyday activities, social activities, and self

6

awareness.  (*Id.*)  Dr. Stoker also recognized that Plaintiff's was oriented as to person, time, and place.  (*Id.*)  Dr. Stoker reported that Plaintiff had recent and remote memory intact.  (*Id.*)  And Dr. Stoker finally noted that Plaintiff did express anxiety.  (*Id.*)

In a May 13, 2009 report, Dr. Stoker examined Plaintiff and stated that there was "no evidence of any fluctuance or induration and pain" of Plaintiff's stump.  (AR at 203.)  Dr. Stoker stated that there were no other problems.  (*Id.*)

On June 3, 2009 Plaintiff saw Dr. Stoker again.  (AR at 240.)  At this visit, Dr. Stoker noted that Plaintiff came in for a follow up examination on his amputation.  (*Id.*)  Dr. Stoker found that one of Plaintiff's chief complaints was anxiety.  (*Id.*)  Dr. Stoker found that Plaintiff suffered from anxiety, insomnia, and depression.  (*Id.*)

At this June visit, Dr. Stoker reported that Plaintiff did not have any difficulty walking or standing.  (AR at 241.)  And Dr. Stoker reported that he did not note any abnormal movements.  (*Id.*)

In June, 2009 Plaintiff had a screening at Genesee County Community Mental Health.  (AR at 216.)  Katie Baxter, a social worker, screened Plaintiff and wrote the assessment.  (*Id*. at 217.)  This assessment shows that Plaintiff was experiencing "[n]ightmares and flashbacks of being shot, depression since being shot[.]" (*Id.* at 216.)  The assessment shows that Plaintiff was reporting "insomnia, lack of appetite, low energy, [and] difficulty concentrating[.]" (*Id.*)

The June, 2009 assessment contains a section in which Plaintiff indicated what types of mental health symptoms he experienced.  (AR at 217.)  In this section, Plaintiff checked "yes" to: feeling depressed, sad, or helpless; losing interest in, or getting less pleasures from things he used to enjoy; being a nervous person; hard to control worry; and having been involved in a traumatic event.  (*Id*. at 217.)

Ms. Baxter noted, though, that Plaintiff was oriented to person, time, and place, was alert and coherent, had fine concentration and coherent thought processes. (AR at 217.) The rest of the screening shows unremarkable results, save for Ms. Baxter "checking" the box that indicated that Plaintiff had a depressed mood. (*Id*. at 218.)

Ms. Baxter concluded that Plaintiff also suffered from PTSD. (AR at 220.) But Ms. Baxter also checked boxes to indicate that Plaintiff's symptoms would not cause a substantial impairment to Plaintiff's daily life and that the "duration" of Plaintiff's impairment was not expected to last longer than six months. (*Id.*) She also noted that she did not expect Plaintiff's impairments to limit him in learning, mobility, self-direction, capacity for independent living, or economic self-sufficiency. (*Id*. at 221.)

On June 22, 2009 Plaintiff saw Dr. Stoker again. (AR at 236.) Dr. Stoker noted that Plaintiff's chief complaints included depression, anxiety, and pain from his leg amputation. (*Id.*) But Dr. Stoker found that Plaintiff had no difficulty walking or standing, had a normal range of motion without pain, and noted no abnormal movements. (*Id*. at 237.)

On September 22, 2009 Plaintiff once again saw Dr. Stoker. (AR at 232.) Dr. Stoker noted that Plaintiff's chief complaints included pain from his leg amputation, depression, and anxiety. (*Id.*) Dr. Stoker addressed Plaintiff's musculoskeletal condition. (*Id*. at 233.) Dr. Stoker found that Plaintiff had no difficulty walking or standing, had normal range of motion without pain, and noted no abnormal movements. (*Id.*)

On October 5, 2009 Dr. Stoker saw Plaintiff again. (AR at 227.) Dr. Stoker wrote that Plaintiff's chief complaints included fatigue, depression, and his amputation. (*Id.*) Dr. Stoker also noted that Plaintiff had a past history of depression and anxiety. (*Id.*) Dr. Stoker found Plaintiff

8

positive for depression and insomnia.  (*Id*. at 228.)  But Dr. Stoker also found Plaintiff to be clean, well-nourished, and oriented.  (*Id*. at 229.)

In the same report, Dr. Stoker noted that Plaintiff had "[n]o difficulty walking or standing." (AR at 229.) Plaintiff, in addition, had a normal range of motion without pain.  (*Id.*)  Dr. Stoker also did not note any abnormal movements or atrophy.  (*Id.*)

In the psychiatric assessment section, Dr. Stoker wrote that Plaintiff did have "positive depression," but Plaintiff still had normal judgment and insight for everyday activities, social activities, and self-awareness.  (AR at 230.)  Dr. Stoker against stated that Plaintiff was oriented as to person, time, and place, and that Plaintiff's short and long-term memory were intact.  (*Id.*)

Plaintiff has submitted additional evidence from the Hurley Medical Center.  This evidence from late 2009 and early 2010 shows that Plaintiff's stump was healing well and had no major complaints.[2] (AR at 251, 254.)

On December 15, 2009 Plaintiff had an adult assessment from Hurley Medical Center.  (AR at 279.)  In this assessment, Plaintiff checked boxes that he had depression and anxiety/panic attacks. (*Id.*)  He also checked boxes that he required some assistance with walking, but that he did not require any assistance with eating or bathing.  (*Id.*)

The remainder of the record is unremarkable.

###     5.     The ALJ's decision

The ALJ held that Plaintiff had three severe impairments: below-the-knee amputation, depression, and anxiety.  (AR at 21.)  The ALJ stated that these three impairments caused more than

---

[2]As Defendant notes, the Court may not consider evidence that the ALJ did not consider, unless for remand.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  The Court did not factor this evidence into its recommendation.

a minimal limitation on Plaintiff's ability to perform basic work activities.  (*Id.*)

The ALJ then discussed Plaintiff's alleged PTSD.  (*Id.*)  The ALJ held that Plaintiff's alleged PTSD was not a severe impairment.  (*Id.*)  The ALJ noted that Plaintiff stated that he had been diagnosed with PTSD and testified that he heard voices and had trouble dealing with people.  (*Id.*) Despite this testimony and the social worker Katie Baxter's PTSD diagnosis, the ALJ found that there was "no persuasive evidence in [Plaintiff's] medical records . . . to indicate that the condition imposed more than minimal limitations on his ability to perform basic work activities."  (*Id.*)  The ALJ then stated that he did take into account Plaintiff's symptoms relating to PTSD when analyzing Plaintiff's depression and anxiety.  (*Id.*)

The ALJ also found that Plaintiff's alleged gastro-esophageal reflux disease was not a severe impairment.  (AR at 22.)  The ALJ found so, noting that there was no persuasive evidence in the record to indicate that the reflux disease caused anything more than minimal limitations on Plaintiff's ability to perform basic work activities.  (*Id.*)

The ALJ then discussed whether Plaintiff's alleged impairments met the various criteria in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ discussed Plaintiff's evidence and analyzed the evidence under the Musculoskeletal System, Affective Disorder, and Anxiety Related Disorder rubrics.  (AR at 22.)

As to a musculoskeletal disorder, relating to Plaintiff's amputation, the ALJ found that the evidence did not support a disability finding.  (AR at 22.)  The ALJ noted that the record did not document that Plaintiff was unable to get around and the 2009 treatment records show that Plaintiff had no difficultly walking or standing.  (*Id.*)

As to the affective and anxiety related disorders, the ALJ concluded that the record did not

10

establish that Plaintiff's impairments met the threshold paragraph A of either of the impairment sections.[3]  (AR at 22.)  Despite finding that Plaintiff would be unable to meet the paragraph A requirements, the ALJ analyzed Plaintiff's impairments under the paragraph B requirements; and he found that the record also could not support an impairment under the paragraph B requirements.[4] (*Id.*)  The ALJ stated that Plaintiff only had mild difficulty in paragraph B's first three criteria and that Plaintiff suffered no episodes of decompensation.  (*Id.* at 22-23.)

The ALJ also discussed the paragraph C criteria and found that Plaintiff failed to meet that criteria, as well.  (AR at 23.)

The ALJ then formulated Plaintiff's RFC; the ALJ ultimately determined that Plaintiff would

---

[3]

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04 paragraph A requires Plaintiff to show "[m]edically documented persistence, either continuous or intermittent" of various symptoms.  12.06 paragraph A also requires "[m]edically documented findings[,]" of various criteria.

[4]

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders requires Defendant to analyze when determining whether a claimant's mental disorder is severe and limits the claimant's ability to perform substantial gainful activity.  Paragraph C requires Defendant to assess the claimant's functional limitation using four criteria: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  *Id.*  For Section 12.04 affective disorders, the requisite severity is met when the claimant shows that he has two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.  *Id.* at 12.04(B).  A plaintiff can also meet the 12.04 listing by establishing the 12.04 Paragraph C criteria: "Medically documented history of a chronic affective disorder or at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1.  Repeated episodes of decompensataion, each of extended duration; or 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  *Id.* at 12.04(C). For Section 12.06 paragraph B is the same as for Section 12.04. Section 12.06's paragraph C criteria is that the impairment "result[s] in [a] complete inability to function independently outside the area of one's home."

be able to perform work that does not require exertion above the sedentary level; or more than simple, routine, repetitious tasks, with one or two-step instructions; and that allows Plaintiff to alternate or stand at will. (AR at 23.)  The ALJ concluded that he found that Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms" but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent that they [were] inconsistent with" the ALJ's RFC determination. (*Id.*)

In calculating Plaintiff's RFC, the ALJ reviewed the evidence discussing Plaintiff's amputation and recovery and the very few notes related to Plaintiff's alleged mental impairments. (AR at 24.)  The ALJ first noted that, in 2007, Plaintiff had been shot in the ankle; that shooting eventually required Plaintiff's below-the-knee amputation.  (*Id.*)  The ALJ reviewed October, 2007 physical therapy notes that showed that Plaintiff performed well on a number of physical tests (hip flexion, knee flexion, etc.)  Those notes also described Plaintiff as having normal muscle tone, good balance, and independent mobility and transfers.  (*Id.*)  And the notes further showed that Plaintiff was enrolled in a technical school for computer training and worked with a prosthetics company. (*Id.*)

The ALJ then reviewed January, 2008 physical therapy notes.  (AR at 24.) The ALJ stated that these notes showed that Plaintiff was discharged for failure to attend therapy.  (*Id.*)  The ALJ further stated that the notes also showed that Plaintiff's strength was within normal limits and that Plaintiff was able to walk around, albeit with a slight limp, using a prosthesis and a single crutch. (*Id.*)

The ALJ then reviewed Plaintiff's 2009 records.  The ALJ stated that, in May, 2009, Plaintiff

12

sought treatment for issues he was having with his amputation. (AR at 24.) The ALJ stated that Plaintiff began seeing Dr. John L. Stoker, Jr. D.O., in 2009. In May of that year, the ALJ pointed out that Dr. Stoker diagnosed Plaintiff with leg pain, anxiety/depression, and tobacco use. (*Id.*) The ALJ stated that the report shows that Plaintiff exhibited normal ranges of motion without pain in his head, neck, spine, ribs, pelvis, upper extremities; and right lower extremity. (*Id.*) The ALJ also noted that the report showed that Plaintiff had had his leg amputated. (*Id.*) As to Plaintiff's judgment and insight, the ALJ recognized that the report showed that Plaintiff's judgment and insight were described as normal for everyday activities, social activities, and self awareness. (*Id.*) The ALJ also noted that Plaintiff was reported to be oriented to time, place, and person, that Plaintiff had recent and remote memory; and that Plaintiff's mood and affect were positive for anxiety. (*Id.*)

The ALJ then noted that, in June, 2009, Dr. Stoker added depression and insomnia to Plaintiff's impairments. (AR at 24.) In October, 2009 the ALJ stated that Dr. Stoker stated that Plaintiff exhibited a normal range of motion and also displayed normal judgment and insight for everyday activities, social activities, and self awareness, and that Plaintiff was oriented as to time, place, and person and intact short and long term memory. (*Id*. at 25.) In this report, the ALJ also noted that Plaintiff was reported to have depression and anxiety. (*Id.*)

After reviewing the records touching upon Plaintiff's anxiety and depression, the ALJ concluded that he was not persuaded that the records showed that Plaintiff's alleged anxiety and depression imposed limitations that precluded all work. (AR at 25.) The ALJ recognized that Dr. Stoker noted that Plaintiff complained of nightmares and flashbacks from being shot, depression, insomnia, lack of appetite, low energy, and difficulty concentrating. (*Id.*) But the ALJ stated that Plaintiff was reported as being oriented times three, alert and coherent, had attention and

13

concentration within normal limits, and had a coherent thought process. (*Id.*) The ALJ further noted that Plaintiff's impulse control, reality testing, judgment, motor activity, and memory were all within normal limits, even though he exhibited a depressed mood and appropriate affect. (*Id.*) The ALJ pointed out that Plaintiff had not been hospitalized for any mental health issue, and that Plaintiff's treatment record was relatively conservative and was routine through the relevant period. (*Id.*)

The ALJ then stated that he included limitations for simple, routine, repetitive tasks involving one or two-step instructions, "to fully accommodate the limitations imposed by [Plaintiff's] mental impairments." (AR at 25.) The ALJ also discussed Plaintiff's GAF score (60), which the ALJ stated generally indicates only moderate symptoms. (*Id.*)

The ALJ summarized that "[t]he medical evidence as a whole does not reasonably support a finding that [Plaintiff] has limitations which would preclude work within the RFC adopted[.]" (*Id.*) The ALJ noted that Plaintiff provided "sparse evidence in support of his allegations."

The ALJ then addressed Dr. Stoker's and Ms. Baxter's opinion evidence. (*Id.*) The ALJ stated that he did not give significant weight to Dr. Baxter's opinion "because the medical records are insufficient to establish that [Plaintiff] is precluded from a reduced range of sedentary work." (*Id.*) The ALJ also stated that he could only give a small amount of weight to Ms. Baxter's opinion, as she is not an acceptable medical source for purposes of his decision. (*Id.*)

The ALJ then stated that he limited Plaintiff's RFC to "less than a full range of sedentary exertion; to no more than simple, routine, repetitive tasks, with one- or two-step instructions or more than occasional contact with the public, coworkers, or supervisors; and to work that allows the alternating of sitting and standing at will." (*Id.*) The ALJ then stated that he found "these provisions fully accommodate all possible limitations imposed by [Plaintiff's] impairments." (*Id.* at 25-26.)

14

The ALJ stated, "[t]o the extent that [Plaintiff] alleges that he cannot work within the scope of the RFC, I find the allegations not fully credible." (*Id*. at 26.)

The ALJ then used that RFC to question the vocational expert whether jobs existed in the economy that someone with that RFC could perform. (AR at 26.) The vocational expert responded affirmatively. (*Id*. at 26-27.) After several questions posed to Plaintiff by his attorney, which the ALJ addressed, the ALJ held that Plaintiff was not disabled as defined by the Social Security Act. (*Id*. at 27.)

### B.    Standards

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.   Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the Court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). If the Commissioner's decision is supported by substantial evidence, it must be

affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### 1.      Framework for social security disability determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff was required to show that:

1.  he was not presently engaged in substantial gainful employment; and

2.  he suffered from a severe impairment; and

3.  the impairment met or was medically equal to a "listed impairment;" or

4.  he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).  If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his residual functional capacity ("RFC"), age, education and past work experience to determine if he could perform other work.  If She could not, she would be deemed disabled.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (citation omitted).  This "substantial evidence" may be in the form

16

of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C.    Analysis

Plaintiff first argues that the ALJ erred in when he found Plaintiff's pain complaint and testimony to not be credible.  From this inaccurate credibility assessment, Plaintiff then argues that the ALJ formed an inaccurate hypothetical that did not accurately portray Plaintiff's impairments. (Pl.'s Mot. for Summ. J. at 6.)

Defendant argues that substantial evidence supports the ALJ's determination of both the physical and mental RFC calculation, therefore making the vocational expert testimony substantial evidence from which the ALJ permissibly denied Plaintiff the benefits he sought.

The Court agrees with Defendant–substantial evidence supports the ALJ's RFC and the ALJ properly evaluated Plaintiff's credibility.

### 1.    Substantial evidence supports the ALJ's RFC

The ALJ limited Plaintiff's RFC to "less than a full range of sedentary exertion; to no more than simple, routine, repetitive tasks, with one- or two-step instructions or more than occasional contact with the public, coworkers, or supervisors; and to work that allows the alternative of sitting and standing at will."  (AR at 25.)

### A.    Substantial evidence supports ALJ's determination of Plaintiff's physical limitations

Here, substantial evidence supports the ALJ's RFC of Plaintiff's physical limitations.  The Court does note that Plaintiff had his leg amputated below his knee.  The Court does not diminish that this amputation has imposed limitations upon Plaintiff's life.  But what Plaintiff and the medical

evidence fail to show is that Plaintiff's leg amputation limited Plaintiff's ability to perform substantial gainful activity.  In fact, as Defendant points out, substantial evidence exists that Plaintiff's leg amputation and prosthesis did not limit him as he stated it did at the hearing.

Substantial evidence supports the ALJ's finding that Plaintiff's amputation does not render him unable to work.  Plaintiff stated on his disability report that his amputation did not affect his ability to sit, use his hands, see, hear, or talk.  (AR at 140.)  On that report, Plaintiff also indicated that his mental faculties also were not affected, as discussed more thoroughly below.  (*Id.* at 127.) Plaintiff's medical evidence also suggests that the ALJ did not err in finding that Plaintiff was able to perform work in which he could sit and stand.  In 2008 Plaintiff's Hurley Medical Center report shows that Plaintiff was able to ambulate with his prosthesis and crutch, had good balance, and had independent functioning in his mobility and transfers.  (*Id.* at 199.)  In 2009 Dr. Stoker noted that Plaintiff did not have any difficulty walking or standing, he also noted that Plaintiff did not have any abnormal movement.  (*Id.* at 241.)  In June 2009 Dr. Stoker also noted that Plaintiff had no difficultly walking or standing, had a normal range of motion without pain, and again, no abnormal movements. (*Id.* at 237.)

Substantial evidence exists therefore that Plaintiff would be able to perform sedentary work with a sit/stand limitation.  The ALJ did not err.

> **B.  Substantial evidence supports the ALJ's RFC determination of Plaintiff's mental limitations**

The ALJ noted that Plaintiff "has anxiety and depression."  (AR at 25.)  But the ALJ stated that he did not find that the record supported that these impairments imposed limitations which precluded Plaintiff from work.  (*Id.*)  The ALJ therefore limited Plaintiff to performing simple, routine, repetitious tasks involving one- to two-step instructions.  (*Id.*)

The Court finds that substantial evidence supports the ALJ's finding. Here, Plaintiff, filling out a disability report, noted that he did not have any problems paying attention, understanding things, finishing something he started, reading, watching a movie, or following instruction. (AR at 127.) Granted, he did state that he had more stress due to his amputation, but he did not indicate this stress limited his mental health in any way that would prohibit him from working. (*Id.*) When Plaintiff began his treating relationship with Dr. Stoker, Dr. Stoker noted that Plaintiff had anxiety, but that Plaintiff's judgment and insight were normal for everyday activities, social activities, and self awareness. (AR at 246.) As shown above, Dr. Stoker noted Plaintiff was oriented as to person, time, and place, and had recent and remote memory intact. (*Id.*) In subsequent visits with Plaintiff, Dr. Stoker noted Plaintiff's depression and anxiety, but did not explain the diagnosis, the symptoms, and found Plaintiff's mental status to be as he found his mental status initially–oriented, with normal judgment to everyday and social activities and self awareness. (AR at 230.)

Plaintiff's reliance upon Ms. Baxter's assessment of PTSD, depression, and anxiety, also does not show that Plaintiff is unable to partake in substantial gainful activity, for even Mr. Baxter found Plaintiff to be oriented to person, time, and place, alert and coherent, and in possession of find concentration and a coherent thought process. (AR at 217.) As to Plaintiff's PTSD diagnosis, even Ms. Baxter found that Plaintiff's alleged PTSD would not cause a substantial impairment; nor would it affect Plaintiff's daily life, or his ability to learn, get around, live independently, or be economically self-sufficient. (*Id*. at 220-21.)

Simple, repetitive, and routine tasks fall within the category of unskilled light work. *Allison v. Apfel*, 229 F.3d 1150, at *4 (6th Cir. 2000) (Table index). Unskilled work "needs little or no judgment to do simple duties that can be learned on the job in short period of time." *Id*. (citing 20

19

C.F.R. § 404.1568(a)). Here, Dr. Stoker and Ms. Baxter found that Plaintiff was oriented, in possession of his judgment, and did not state any findings that Plaintiff was limited in any way mentally. In his disability report, Plaintiff stated that he often interacted with others. (AR at 150.) Given that substantial evidence, Dr. Stoker and Ms. Baxter's opinions support the ALJ's finding that Plaintiff's mental impairments do not prevent him from performing, at the very least, unskilled work with little interaction with others, and that jobs exist in economy that could accommodate Plaintiff.

### 2.      The ALJ properly assessed Plaintiff's credibility

Plaintiff argues that the ALJ erred by dismissing Plaintiff's statements as not credible. (Pl.'s Mot. for Summ. J. at 6.) Plaintiff argues that the ALJ did clearly state his reason for not finding Plaintiff's testimony credible and that the ALJ erred when he did not address Plaintiff's alleged pain in light of the 20 C.F.R. § 404.1529(c)(3) criteria.

A finding on credibility must be (1) based upon the entire case record, and (2) "sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Davis v. Comm'r of Social Sec.*, 10-12594, 2011 WL 4528315, at *2 (E.D.Mich. Sept. 29, 2011)(Cook, J.) (citing SSR 96-7p, 20 C.F.R. § 404.1529(c)(3)).[5] Additionally, since administrative law judges have the opportunity to "observe the demeanor of the witness, his conclusions with respect to credibility should not be discarded lightly and should be accorded deference." *Id.* (citations omitted).

_____

[5]These criteria are: daily activities; location, duration, frequency, and intensity of pain or other symptoms; precipitating or aggravating factors; type, dosage, effectiveness, and side of effects of medication; other treatment received for pain or symptom relief; other measures used to relieve pain or symptoms; and other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)

Here, the ALJ stated,

> After careful consideration of the evidence, I find that [Plaintiff's] medically
> determinable impairment could reasonable be expected to cause the alleged
> symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and
> limiting effects of these symptoms are not credible to the extent they are inconsistent
> with the above residual functional capacity assessment.

(AR at 24.)  The ALJ then went on to discuss the evidence upon which he relied in formulating his

RFC and showed how that evidence was inconsistent with Plaintiff's allegations of pain.  The ALJ

specifically pointed out that in October, 2009, Dr. Stoker noted that Plaintiff had normal ranges of

motion without pain.  (AR at 24-25.)  And the ALJ discussed evidence that Plaintiff had normal

insight and judgment for everyday activities, social activities, and self awareness.  (*Id.* at 25.)  As

to the other 20 C.F.R. § 404.1529(c)(3) criteria, such as duration of pain, precipitating factors, and

side effects, the record is absent of any evidence.  The Court therefore finds that the ALJ discussed

and rejected Plaintiff's statements about his pain.

### D.    Conclusion

For the above-stated reasons, the Court recommends denying Plaintiff's motion for summary

judgment, granting Defendant's motion for summary judgment, and dismissing this case.

## III.   Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation,

but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28

U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a

waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of*

*Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th

Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will

not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated:  December 13, 2011           s/ Mona K. Majzoub
                                    MONA K. MAJZOUB
                                    UNITED STATES MAGISTRATE JUDGE


### PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: December 13, 2011            s/ Lisa C. Bartlett
                                    Case Manager